Ryan for Petitioner Mr. Zhu. I'd like to reserve three minutes for rebuttal. Could you speak up just a bit, please? Yes, Your Honor. Thanks. Were it not for the parade of horribles that he has suffered, Mr. Zhu would be a lawful permanent resident of this country today, instead of facing a 10-year bar to his reentry as a penalty for not voluntarily departing the United States. Regarding the remedy here Is the record clear? He decided not to voluntarily depart because of the fact that if he went in to adjust status, they might check his background and find out that he was subject to a deprecation order? No, Your Honor. What happened was he simply did not know the status of his voluntary departure order. But didn't I read somewhere in the record in this case that at some point he made a decision, because there's like a five-year delay here, right? And at some point during that period, he was warned by his attorney that if he sought to adjust status, that the risk in doing so would be that they would determine that he was subject to a deportation order and might deport him. Well he did know that when he talked to his third attorney. Right. And so even then, what did he do? Well, at that point He had a 30-day notice, Mr. Chen told him, and he didn't take the notice, right? Well, Judge, I answer both, of course. He wasn't aware at all of the status of his voluntary departure order. He clearly became aware at some point, did he not? Well, I don't know that he did, Judge Tallman, because he was never given the opportunity to leave this country in the first place. The denial of the petition for review wasn't known to him until six months after the mandate issue, eight months after the decision. That was mid-19, mid-2004. That is correct. Did he leave then? He did not leave, of course, at that time. Okay. What's the excuse for that? Well, by that time, he had lost any right to voluntarily depart. It wasn't his fault. And that's why we think the Zemchuska case is pertinent in respect to that. Mr. Wright, I stopped him from getting on a plane and leaving. I don't understand. When he found out that he lost in May 2004, instead of leaving, he stuck around. It would have been fundamentally unfair to, at that point, assess that he didn't have any recourse to try to recapture the voluntary departure order that the board issued. Mr. Wright, let me point you to what's really bothering me about the position you're taking. I'm looking at paragraph 19 of the declaration that your client signed. It's an excerpt of Record 141, and it talks about a conversation that he had about the time of the birth of his child, Kelly, October 13, 2005, with Ms. Ford, his attorney. That she informed me that there were risks in reopening my case, and there was a chance that I would be taken into custody while such a request was pending. I decided not to do anything at that time. I find that inconsistent with his position that he didn't know that he was the subject of a deportation order and that his voluntary departure privilege had expired. Well, Your Honor, I believe our position is consistent to the extent that he wasn't aware in a timely fashion that he had a voluntary departure order, but that it wasn't preserved at the Ninth Circuit. The bottom line is he's asking us essentially to grant him equitable relief on the grounds that I didn't know. The problem I'm having is he's coming to me with dirty hands. And paragraph 19 of his declaration basically says to me, well, I knew at some point during the period that, but I made a willful decision not to pursue an adjustment of status to try and lawfully stay here because I was afraid that if I did so, they'd take me out of the country. Now, that makes it difficult for me to have a lot of sympathy for him that he's entitled to equitable relief. Well, of course, the whole matter is complex on the law. One could not assume that an immigrant from China and a lot of immigration lawyers, I might add, would understand all of the complexities of this particular case. And so the train had already left the station. He had already lost his voluntary departure. That, and I don't know if the record explicitly reflects that in the conversation you have with the third attorney that you're referring to, Judge Tallman. But suffice it to say, he had already lost any opportunity, and unfairly so, to leave the country and then counsel a process for adjustment of status in China, and that's all he's asking. What do we do with the fact that he originally made an ineffective assistance of counsel claim? I believe it was lodged by Ms. Fort, but it's a little difficult to figure out who was on first in this case, at what point in time. That basically the IAC claim was my prior attorney, was it Ms. Matthews, who's now deceased, didn't file the departure bond. And then the board looks, the government looks into it, and the board concludes that just isn't true. That, in fact, she did file the departure bond. What happened, Your Honor, is when we got the case, he had made that allegation. We investigated, and we investigated very thoroughly. We talked to the attorney for the estate, we talked to the account, we talked to the prior attorneys, we talked to a lot of people. I talked to the ICE officer up in Tacoma, and he had the file. And I said, do you have the voluntary departure bond papers? He said, no. And I believed him because the papers were posted, the bond was posted in San Francisco, the file was in Tacoma. And it wasn't until we filed the motion to reopen that, lo and behold, and we had asked the Office of Chief Counsel, by the way, in Seattle to join us in a motion. So I'm not saying anybody didn't give us heads up on this, but we made a lot of efforts on this to try to find out that particular fact. Well, it was attached in the exhibit to their opposition to the motion to reopen. And so we had to shift gears, and because of the changed circumstances, we then focused on the error that was made here by the third attorney. That's what happened. You mentioned you wanted to reserve three minutes. I guess I, not at that point. Okay. Thank you, Judge Silverman. Thank you, Mr. Ryan. We'll hear from the government now, please. If it please the court, I am Don G. Scroggin, and I represent the United States Attorney General in this case. What is clear in this case is that Petitioner filed his motion to reopen late, and the board properly denied it on the statutory basis that it was filed late. It was filed five years late. I'd like to address the question that your honors have raised with Petitioner regarding the sequence of events and whether Petitioner was, as Petitioner alleges, somehow disabled from leaving the country pursuant to his obligation in his bargain of voluntary departure. What is clear from the record is that the voluntary departure was long expired when he filed his motion to reopen. It is also clear from the record that Petitioner knew he had a grant of voluntary departure. He was present when it was discussed by the immigration judge. He declares in his own declaration in the record at page 140 that he knew he had a grant of voluntary departure. The sequence of events, I think, is revealing. The board denied his appeal from the immigration judge on March 27, 2002. Three days later, he married a legal permanent resident. A few days later, she filed an I-130 on his behalf so that he might adjust his status. She filed her I-130 on April 25, 2002. The grant of voluntary departure was still valid at that point. Petitioner knew he had a grant of voluntary departure. Petitioner knew that he was married. I think we could presume that. And Petitioner knew that he must, in order to preserve his rights with assistance of counsel at this point, that he must leave the country pursuant to a grant of voluntary departure in order to be eligible to adjust. Petitioner, however, did not leave the country. Indeed, the record is devoid of any evidence that Petitioner ever intended to leave the country. Petitioner's arguments are carefully crafted. They say he could have left the country. Nowhere does Petitioner argue that he would have left the country or that he intended to leave the country. The case then comes to the Ninth Circuit in 2003. His petition is denied and the mandate issues. At that point, is there another opportunity for him to voluntarily depart, or has he, in fact, forfeited the opportunity at that point? Or would he have had a remedy had he done something following the issuance of this Court's mandate? According to the law at that time, Your Honor, he would have had the remainder of his voluntary departure after the mandate issued from this Court. Now, he alleges that he did not know that the decision that his petition for review was denied until a year later. However, he did have, according to the law at that time, the law of this circuit was evolving at that time, and it was unclear. Indeed, El-Hemry, the first time this Court recognized that it has the authority to stay voluntary departure, was handed down on the very day that his petition for review was denied. September 19, 2003. Well, let me follow up with Judge McEwen's question. What option did he have when he did learn that the mandate issued? Could he have voluntarily left, and would he have been able to come back or apply for adjustment at that point? At that point, his voluntary departure had expired, and at that point, he could have filed a motion to reopen with the Board. He waited another two years. What would have happened if he had? In other words, in 2004, a year after our decision, assuming that's when he found out, he would have said, I didn't find out, but now, and of course, I can't depart now because my time has expired, I want to file a motion to reopen my case. But he did not file a motion to reopen. He did not recognize he did. He waited two years to do so, which I think leads directly to Petitioner's theory of this case. Petitioner's theory of this case is that he was not aware of the fact that he was not aware of the fact that his time for voluntary departure had expired. He was still – I mean, he would have been able to leave the country voluntarily, couldn't he? Not pursuant to a grant of voluntary departure. He could have left voluntarily, but he wouldn't be called leaving voluntarily. Correct. He would have – he could have left the country at any time, but he could not have left with the benefit of the voluntary departure. So he wouldn't – the fact that he left doesn't get him anywhere, does it? Doesn't get him anywhere. That's correct. Is the BIA's imprimatur on a motion to reopen to, in effect, give him some relation back or to extend his voluntary departure period? Correct, Your Honor. But he did not seek that. He waited two years, which I think reflects Petitioner's approach to this case, which is of delay, delay, delay. Petitioner – Petitioner's theory of this case is that he may unilaterally enter into the bargain of – that he may unilaterally abrogate the bargain of voluntary departure into which he has – he's requested voluntary departure. It has been granted. His theory of the case is he may set aside that bargain. And this Court, in the Zazuita case, has expressed – has expressed clearly what this bargain is between the government and Petitioner when voluntary departure is granted. Petitioner's theory is that after abrogating his agreement to leave pursuant to voluntary departure, years later, at his convenience, he may resurrect voluntary departure and request that the board reinstate it, even though he waited two years after he learned that he was – no longer had voluntary departure even to request that benefit, and now he requests that this Court still later grant him voluntary departure. The Zazuita case in this circuit addresses Petitioner's who take this approach. And if I may, I would just read one sentence from that decision. If, after years of delay, Petitioner is again rewarded with the opportunity for voluntary departure which he has previously spurned, what incentive is there for any alien similarly circumstance to depart promptly when first given the opportunity? That's what this case is about. It is about delay. It is about motions to reopen, motions to reconsider, which the Supreme Court says are disfavored, because surely this Court recognizes that there is a doctrine, a generic doctrine, of repose, of finality in litigation. And this case has gone on now for 10 years. Petitioner believes that he may set aside voluntary departure at his convenience when it suits him, and he may resurrect it. He had an opportunity to depart and take full benefit of his voluntary departure. He knew that he was married. He knew that his wife had filed an I-130, and he knew that he still – and he knew that he must depart pursuant to the grant of voluntary departure, but he did not do so. The Board, therefore, properly denied his motion to reopen because it was late, and he also properly found that pursuant to the Board's regulatory doctrine of equitable tolling, the petitioner did not qualify. There is a larger issue in this case, which Respondent has raised and which this Court has not yet addressed, and that is the question of whether or not Petitioner has a constitutional right to effective representation in a civil immigration proceeding. Judge McKeown, I know you were the author of the MRG Zing decision in which Respondent sought rehearing, which was denied. And what we have raised in our brief, again, for this Court to consider, and we do urge the Court to consider, the Coleman, Wainwright, and its progeny from the Supreme Court of the United States. Even if I disagreed with myself, I couldn't overrule myself at this point, right? Well, respectfully, Your Honor, I hope it will not be painful if I am allowed to read one sentence from the MRG Zing decision in closing. And this is from your brother on the circuit, Judge Wallace, who wrote a concurring opinion agreeing in the result. Judge Wallace writes, our Court has mistakenly incorporated a criminal case constitutional right into civil cases. This is unnecessarily complicated, an already overburdened immigration enforcement process. I suggest our Court reconsider the question, this questionable rule. Judge Wallace says there is no constitutional right to an attorney. Petitioner cannot claim constitutionally an effective assistance of counsel. This makes sense because the effective assistance of counsel is not necessary to render immigration proceedings full and fair. With all due respect, Your Honors, I suggest that this Court eventually must address the Coleman case. In this case, or in some other case, this case raises that issue. It is relevant, and I would urge the Court to consider the Supreme Court's holding of Coleman. Mr. Sotomayor, if that issue is as significant as I hear you arguing it, why doesn't Boyle go to the Solicitor General and say, you know, the Ninth Circuit has wandered off the reservation again and needs correction, and seek a petition for certiorari so that we can settle the law in this area? Well, we have not reached that point, Your Honor. I would, to the credit of the Court in the final statement, I would simply say that you are not alone. This is not the only circuit that is so held. Well, that's why I asked the question. I mean, it seems to me that we see these IAC claims all the time, and if the Department's position is we shouldn't be incorporating these criminal law notions in immigration context, and if you're seeing it all over the country, why not get the Supreme Court to resolve it? It's a stepwise process, as I'm sure you know, Your Honor, and I would simply suggest that if Coleman is correct, I would urge this Court to consider it and apply it to this case, and if it is wrong, I would suggest the Court has an obligation to tell us why it is wrong, and to explain it. And I say I view it as a constitutional right to counsel. It's not really phrased that way so much as there is a due process right in immigration hearings. You don't disagree with that proposition, correct? As Judge Wallace says, that due process right to a full and fair hearing can be met without the right to counsel. Well, but the question is, the question is really a broader one. There is a due process right of the Petitioner within the immigration hearing system, correct? I beg your pardon? There is a due process right within the system. Now, how you define it, you might disagree with, but you don't, I assume, disagree that there is a due process right? No, I do not, Your Honor. Indeed, Judge Wallace said that, that the full and fair ---- Counseling, you know, counseling, what we're always told to do by the Supreme Court is, if we don't have to jump off into constitutional land, we shouldn't. This case seems to me to be precisely the kind of case where we wouldn't even need to reach that issue given the sequence of events. Do you agree? I would agree, Your Honor. I would simply say the issue is raised once again and urge its consideration. Thank you, Mr. Scruggs. Thank you. Mr. Ryan, you get the last word. I think you have about three minutes left. Third counsel should have filed a motion to reopen right away after learning of the Ninth Circuit's decision, when she learned about it, of course, in May of 2004. So that also supports our ineffective assistance argument. I'd also like to point out in the Zuzka case, which interpreted the voluntary relief statute, that particular noncitizen waited several years before filing the motion to reopen in that case. Our case is very similar in that respect. Well, except the difference here, and I don't mean to beat a dead horse, Mr. Ryan, but the difference here is it does seem that there is an element of knowing and willfulness on the part of your client. That's how I read paragraph 19 of his declaration, that he made a calculated decision. It's like the conversations that lawyers have with their clients all the time. Well, what happens if I don't do it? And that's basically the obstacle that I see in terms of applying the other cases that speak in terms of equitable relief. There are a couple of things. First of all, at that time, Congress was considering a comprehensive immigration reform bill, and a lot of attorneys were saying, stay around, this might pass. So that was part of the, and I believe that's in the declaration as well, that particular paragraph. He was married. He had children. In fact, he had a child before he got married to his current wife. I'd also like to point out in the Zuzka case, the BIA made it clear that the person who is an alien through no fault of his or her own is unaware of the voluntary departure order or is physically unable to depart, end quote. That's Zuzka in 94. But you're not claiming physical inability. This has to rise or fall on the question of whether or not he knew that the voluntary departure order had expired. Well, on both points, Your Honor, yes. But we would also emphasize the fact that he was physically unable to depart because he didn't know that his attorney had not preserved his right to leave this country in a timely fashion after the Ninth Circuit had denied his petition. Illness or death in the family, it has to do, I guess he's physically disabled as a matter of law, is that what you're saying? Well, I think you can conflate the two. Well, I think you are conflating the two, and I'm not sure that the Board did that when it talked about the exceptions to voluntary departure. Well, and the other argument, and we've argued this I believe in our brief, is that once the voluntary departure period expires, that's it. Whether the alien knew that there was an order in the first instance that the BIA had extended voluntary departure, or whether he knew at the back end, or didn't know at the back end that the Ninth Circuit had denied his petition and that the mandate had issued, and then finds out six months later that, my goodness, my voluntary departure period has expired. That's being disabled. That's legally disabled. We call it physical, but we have argued both, really. Legal disability, I would agree. Judge Tallman, that's a better description. Thank you very much, Mr. Scroggins. Thank you, Judge. Mr. Scroggins, thank you as well. The case is now being submitted. Good morning, gentlemen. Next case is 0615212, Evans v. Chase Bank. A reminder, each side will have ten minutes on this case. Thank you. Is the appellant ready? Good morning. Good morning.
judges: Silverman, McKeown, Tallman